A PROJECT OF THE UNIVERSITY OF CALIFORNIA IRVINE NEWKIRK CENTER FOR SCIENCE & SOCIETY,
UNIVERSITY OF MICHIGAN LAW SCHOOL & MICHIGAN STATE UNIVERSITY COLLEGE OF LAW



**The National Registry of EXONERATIONS**

**CURRENTLY 2,177 EXONERATIONS
MORE THAN 18,750 YEARS LOST**

BROWSE CASES   ISSUES   RESOURCES   ABOUT US          MAKE A GIFT

# KEITH MITCHELL

**Other Cook County Exonerations with False Confessions**


Keith Mitchell

On the afternoon of July 22, 1992, two gunmen opened fire on a group of people standing on the corner of 79th Street and Ellis Avenue on the South Side of Chicago, Illinois. Thirty-seven-year-old Howard Shell was killed and two others—72-year-old John McDaniel and 22-year-old Kevin Braham—were wounded.

Witnesses said the two gunmen were between the ages of 18 and 24. They said that one ran up to a car on nearby Dobson Street, took off his jacket, and placed it in the vehicle. One witness, Joseph Tribett, said he would recognize the gunmen if he saw them again.

Police immediately suspected that Jermaine Bates was responsible. A day earlier, Shell and others had forced their way into the Bates family home and robbed Jermaine's mother, Debra, in a dispute over missing narcotics. Debra Bates had called police to report the incident, but then changed her mind about pressing charges. She told police she would handle the matter herself.

About a week later, Chicago police detective Michael McDermott brought Jermaine Bates in for questioning. Jermaine told police that he was a member of the Vice Lords street gang and admitted that he had handled the guns used in the shooting. He said, however, that the gunmen were 15-year-old Keith Mitchell and 19-year-old Tyce Dove, and that 19-year-old Lanell Townsend drove the getaway car. Jermaine said all three were also members of the Vice Lords. Shell was a member of the Gangster Disciples, a Vice Lords rival.

On the morning of August 1, 1992, Dove and Townsend were arrested. Dove signed a statement at 5:30 a.m. implicating himself, Townsend, and Mitchell. He would later testify that McDermott and detective Jack Wilkins choked him and gave him nothing to eat or drink until he gave a statement based on facts the detectives fed to him.

Townsend denied involvement. He later asserted that McDermott hit him in the face, choked him, and banged his head against the wall of the interrogation room. When Townsend refused to confess, McDermott called him a "young, dumb nigger." Ultimately, McDermott wrote a police report saying that Townsend had confessed, claiming that Dove shot Shell and that Mitchell fired gunshots into the crowd of people.

Mitchell, who had never before been inside a police station, learned that police were looking for him. Shortly after midnight on the morning

| State: | Illinois |
|---|---|
| County: | Cook |
| Most Serious Crime: | Murder |
| Additional Convictions: | Assault |
| Reported Crime Date: | 1992 |
| Convicted: | 1995 |
| Exonerated: | 2017 |
| Sentence: | 30 years |
| Race: | Black |
| Sex: | Male |
| Age at the date of crime: | 15 |
| Contributing Factors: | False Confession, Perjury or False Accusation, Official Misconduct, Inadequate Legal Defense |
| Did DNA evidence contribute to the exoneration?: | No |

of August 2, 1992, Mitchell and his mother, Audrey Mitchell, went to the police station where they met with McDermott and Wilkins. Audrey said she was going to get a lawyer and told Mitchell not to talk to the detectives. After she left, the detectives began talking to Mitchell anyway. Although Mitchell denied involvement, the detectives told him, "You might as well go ahead and tell, you will get probation."

When Mitchell's mother returned to the interrogation room, she found the detectives interrogating Mitchell. She again asked them to stop and went to answer a page from her sister's husband. Mitchell later testified that the detectives left, but returned as soon as Audrey was gone and the interrogation changed tone.

The detectives told him that he wasn't going to leave the station, and that he was going to tell them what happened whether he liked it or not. They repeatedly popped their knuckles, made fists, and drew their guns.

Mitchell's mother returned once more to the interrogation room and reported that a lawyer had been contacted. She then left in response to a page from the lawyer, Fredrenna Lyle, who told her that she would come to the police station. When Audrey was walking up the stairs to return to the interrogation room, a different detective told her she was no longer needed. When she insisted she be allowed to return, she was told that she would be arrested if she didn't leave.

Audrey called attorney Lyle, who called the station to let them know that she was on her way and to ask that the interrogation cease. The detectives, however, ignored her. Instead, they told Mitchell that he didn't have to worry about his mother being present—now he could tell them the truth.

Not long after, a prosecutor, Sharon Jefferson, came into the interrogation room and a youth officer arrived, but remained only briefly. Then, not long after, Audrey Mitchell and Lyle arrived. Lyle instructed that the questioning should stop and that if the detectives wanted to question him, they needed to contact her.

Despite this instruction, McDermott and Wilkins resumed interrogating Mitchell as soon as Lyle left the station. They subsequently reported to the prosecutor that Mitchell had orally admitted involvement in the shooting. Jefferson, the prosecutor, later testified that Mitchell admitted that he told the detectives the truth about his involvement, but that he did not want to give or sign a written statement.

Mitchell was charged as an adult with first-degree murder and two counts of aggravated battery. Prior to trial, his defense attorney filed a motion to suppress the alleged confession.

McDermott testified and denied that Audrey Mitchell ever said she was going to get an attorney, and denied that Mitchell said he did not want to talk to them. McDermott said that Mitchell told them he wanted to tell the truth—that he was involved—but did not want to say it in front of his mother. McDermott said that Mitchell confessed at 3 a.m., although police reports showed that the youth officer wasn't contacted until after 3 a.m.

Wilkins testified and said that McDermott had pulled him aside not long after Mitchell and his mother arrived. He said that Mitchell wanted to confess, but not in front of his mother. Wilkins produced notes that he said he made of Mitchell's admission, but conceded he had never shown them to Mitchell or asked him to sign them. Moreover, no police report referred to Mitchell's alleged admissions.

Mitchell testified and denied involvement in the crime. He also denied implicating himself in the crime. He said he did tell the detectives he had heard shots that night from a distance, but asserted that he only told the police that because he was scared. He said those "little things" were false and the result of being threatened and coerced.

The court denied the motion to suppress the confession, and in the spring of 1995, Mitchell and Townsend went to trial in Cook County Circuit Court. Townsend chose to have his case decided by the trial judge without a jury and Mitchell chose to have a jury decide his case.

Case: 4:16-cr-00440-RLW   Doc. #: 278-1   Filed: 02/28/18   Page: 3 of 11 PageID #: 1426

The two surviving victims testified about the shooting, but were unable to identify who shot them. The detectives testified that Mitchell had confessed. Inexplicably, no evidence was offered regarding Townsend's alleged oral confession.

Mitchell testified about how the detectives refused to stop questioning him, and that they intimidated and threatened him. He denied any involvement in the crime. He said that while he had visited the Bates home at various times, it was only to exchange video games. His mother and the attorney, Fredrenna Lyle, testified about their efforts to stop the interrogation and how those efforts were ignored.

On April 7, the trial judge acquitted Townsend and declared a mistrial in the case against Mitchell when the jury was unable to reach a unanimous verdict.

Mitchell went to trial a second time in July 1995 along with Tyce Dove. Separate juries were empaneled to hear each of their cases at the same time.

The evidence against Mitchell was virtually the same as in the first trial. However, after the defense finished presenting its evidence, the prosecution called a new rebuttal witness. Gene Keller testified that Mitchell was a member of the Vice Lords street gang—the gang that police believed was responsible for the shooting and whose members included Jermaine Bates. Keller said that he and Mitchell were initiated at the same time.

Keller testified that two days after the shooting, he told police that he was in a car with Townsend on the day of the shooting when Dove ran up and gave a bundled-up jacket to Townsend. The prosecution contended that this supported Dove's confession.

Keller admitted that he had recanted that statement almost immediately afterward, but said that he did so because he was afraid of retaliation from fellow gang members. Keller admitted that he had been subpoenaed to come to Mitchell's first trial, but did not appear and was still facing a contempt of court petition for that failure to appear. He also admitted that in May 1995—a month after his failure to appear—police spotted him and he fled in a car, escaping but striking another vehicle in the process. He said he turned himself in the following day and was later placed in a witness protection program. Keller testified that he was not charged in the hit and run accident, and that he had been promised that the contempt petition would be withdrawn after he testified.

Unlike Mitchell's attorney, Dove's defense attorney presented testimony pointing to Jermaine Bates as the real criminal. McDermott admitted that Bates's mother had been robbed the day before the shooting by Howard Shell, the man who was fatally shot. McDermott also admitted that Debra Bates initially called police to report the robbery, but then said she did not want to press charges because she would handle the matter herself.

McDermott testified that he believed Jermaine Bates had knowledge of the shooting, but was not involved because he lived too close to where the shooting occurred. He conceded that Bates had flunked a polygraph when asked about involvement in the shooting and that witnesses said the getaway car was gray—the same color as Bates's car.

During closing argument, the prosecution argued—improperly—that McDermott would never lie because if he were to frame an innocent 15-year-old, McDermott "would have been in prison a long time ago."

On July 24, 1995, Mitchell's jury convicted him of first-degree murder and two counts of aggravated battery. Dove's jury acquitted him. Mitchell was sentenced to 30 years in prison.

Mitchell's convictions were upheld by the Illinois Court of Appeals in 1998. In 2002, Mitchell filed a post-conviction seeking a new trial on the ground that his confession was false and should have been barred from his trial.

In 2016, after Kim Foxx was elected Cook County State's Attorney, the prosecution conducted an independent review of Mitchell's case. In October 2017, the prosecution made an oral motion to vacate Mitchell's convictions, but the trial court declined to grant it, saying that the prosecution should return with a written motion.

On November 6, 2017, the Cook County State's Attorney's Office and Mitchell's lawyers, Gayle Horn and Tara Thompson, filed a joint motion to vacate the convictions and to dismiss the charges against Mitchell. The motion said that the prosecution, following its review of the case, had concluded that Mitchell had "made a substantial showing that his constitutional rights were violated."

– Maurice Possley

Report an error or add more information about this case.

Posting Date: 11/16/2017

## ABOUT THE REGISTRY

The National Registry of Exonerations is a project of the Newkirk Center for Science & Society at University of California Irvine, the University of Michigan Law School and Michigan State University College of Law. It was founded in 2012 in conjunction with the Center on Wrongful Convictions at Northwestern University School of Law. The Registry provides detailed information about every known exoneration in the United States since 1989—cases in which a person was wrongly convicted of a crime and later cleared of all the charges based on new evidence of innocence.

## CONTACT US

We welcome new information from any source about exonerations already on our list and about cases not in the Registry that might be exonerations.

- Tell us about an exoneration that we may have missed
- Correct an error or add information about an exoneration on our list
- Other information about the Registry
- Sign up for our Newsletter

Follow Us:

# LOEVY & LOEVY

311 N. Aberdeen St., 3rd Floor, Chicago, Illinois 60607

January 12, 2018

Re: Kehinda Mitchell

Dear Sir or Madam:

This letter is to inform you that Kehinda Mitchell is represented by our firm, Loevy & Loevy, in connection with his civil rights claims arising out of his wrongful conviction for a 1992 murder that he did not commit. Mr. Mitchell is in the process of preparing to file a civil rights lawsuit that, among other claims, will raise claims under 42 U.S.C. Section 1983. Mr. Mitchell is also pursuing, with the assistance of the Exoneration Project at the University of Chicago Law School, a Certificate of Innocence under Illinois law, 735 ILCS 5/2-702.

While we cannot guarantee any outcome for Mr. Mitchell, if successful in his pursuit of a Certificate of Innocence, Mr. Mitchell could be awarded in excess of $199,150. If Mr. Mitchell's civil rights claims proceeded to trial, we could seek $1 to $2 million dollars per year for each of the 15 years that he wrongfully served in prison.

Please let me know if you have any questions about Mr. Mitchell's case - we will do our best to answer them.

Very truly yours,

*Tara Thompson*

Tara Thompson

cc: Kehinda Mitchell



## CONTRACT PROPOSAL

**Client:**             Kehinda Mitchell

**Claim:**              <u>Kehinda Mitchell vs. State of Illinois / City of Chicago, et al.</u>,
                        COI - 92 CR 19459 / Case #TBD

**Contract Number:**    18IL.523

**Funded Amount:**      $20,050.00

**Date of Contract:**   February 23, 2018

**General Terms:**      Subject To Minimum Return of 10% of Amount Funded
                        No Pre-Payment Penalties after 10% Minimum
                        Funding Charge Prorated on a Daily Basis after 10% Minimum

    Mr. Mitchell has been approved for Pre-Settlement Funding subject to receiving your signed Acknowledgment of Convenience Request. Please sign this document and fax it back to our office as soon as possible. Once we receive the signed Acknowledgment we will be able to distribute Mr. Mitchell's proceeds. Also, attached is a copy of the Settlement Funding Contract for your review.

    Should you have any questions, please feel free to contact me.

Sincerely,

*Suzan H. Wojtan*
Suzan H. Wojtan



February 20, 2018

Kehinda Mitchell
c/o Loevy & Loevy
311 North Aberdeen Street
Chicago, IL 60607

    RE: $20,050.00 Settlement Funding Contract Between Kehinda Mitchell and SMP Advance Funding, LLC
       <u>Kehinda Mitchell vs. State of Illinois / City of Chicago, et al.</u>, COI - 92 CR 19459 / Case #TBD

Dear Mr. Mitchell:

  Enclosed is a Settlement Funding Contract which you will need to sign **and have notarized**. Please initial each page of the Contract. The Contract also has attached a **Convenience Request** which you will need to sign. Please keep one copy of the **Settlement Funding Contract** and attachments for your files. Also, enclosed is a **Disbursement Instructions** (Exhibit B) form which you will need to complete and return to us. This form will direct us as to how you want to receive your loan proceeds.

  We have also enclosed a copy of an **Acknowledgement of Convenience Request and Settlement Funding Contract** (Exhibit A) which has been faxed to your attorney. **Please note your Settlement Funding Contract cannot be made final until and unless your attorney signs the Acknowledgement document and we receive it along with a signed copy of the Settlement Funding Contract, prior to February 23, 2018.**

  As referenced in Sections 1(e), 2(f) and 5 of the Settlement Funding Contract you will be obligated to pay the amount advanced plus accrued interest on said amount at the rate of 36% compounded annually. Please note that as referenced in Sections 1(d), 1(f) there is 10% minimum rate of return that you will pay based off the amount advanced to you. Generally, this will only be applicable if the advance is paid off within a relatively short period of time.

  Also, please note that although the total funded amount provided to you is $20,050.00, you will only be receiving $20,000.00 because we are deducting your $50.00 Processing Fee out of the total funded amount. This is done as convenience for you so you will not have to pay the Fee directly out-of-pocket.

  Finally, under the terms of the Settlement Funding Contract SMP will have a security interest in the proceeds of your pending claim/lawsuit/litigation and may file a UCC Financing Statement with the Illinois Secretary of State to further secure its lien. In the event of such filing you will be responsible at the time the advance is due for reimbursing SMP for any security interest fees paid in perfecting and releasing the security interest related to this Collateral under the Settlement Funding Contract.

  If you have any questions, please free to contact us. Thank you for choosing SMP Advance Funding.

Sincerely,

*Suzan H. Wojtan* (signature)
Suzan H. Wojtan

Enc.

Case: 4:16-cr-00440-RLW   Doc. #: 278-1   Filed: 02/28/18   Page: 8 of 11 PageID #: 1425

# Report finds record number of US exonerations in 2015



Keith Mitchell at his North Side home Thursday Dec. 9, 2015. In 1992, Mitchell then 15 yrs. old was arrested and wrongfully convicted for the murder of Howard Shell. Mitchell spent 14 1/2 yrs. in prison. (Phil Velasquez / Chicago Tribune)

By **Tribune news services**

FEBRUARY 3, 2016, 12:09 AM   |   HOUSTON

The U.S. saw a record number of exonerations in 2015, with nearly 40 percent of the cases involving individuals who were exonerated in homicides, a new report shows.

The National Registry of Exonerations said in its report Wednesday that 149 people falsely convicted of crimes were exonerated last year. That's 10 more than in 2014, the year with the previous highest total since the group began keeping records in 1989. The registry is a project of the University of Michigan Law School and has documented more than 1,730 such cases in the U.S.

Since 2011, the annual number of exonerations has more than doubled and there are now an average of nearly three exonerations a week, said Samuel Gross, a University of Michigan law professor and registry editor.

"What's driving it? Continuing increased interest and sensitivity and concern about the problem but also a focus on increasing activity by conviction integrity units," Gross said. The integrity units are divisions in various district attorney offices around the country that identify and correct false convictions.

Texas, the second-most populous state, had the most exonerations with 54. New York, the fourth-most populous, was second with 17.

Homicides and sex crimes made up nearly half of all exonerations in the U.S. According to the registry, a record 58 defendants who were exonerated in 2015 had been convicted of homicide, with five having received death sentences and 19 having been sentenced to life in prison.

There were homicide exonerations in 25 states and the District of Columbia, with Illinois having the most (11 exonerations), followed by New York (9 exonerations) and Alaska (4 exonerations).

The registry's report also said there was a record 27 exonerations in 2015 for convictions based on false confessions, with 22 of those in homicide cases. Also, 44 of the 58 homicide case exonerations involved cases in which there was official misconduct by authorities.

"The thing that is most troubling to me about these cases is it's clear that for every innocent defendant who is convicted and later exonerated, there are several others who are convicted who are not exonerated because almost all the exonerations depend on a great extent on good fortune, on Lady Luck," Gross said.

Brooklyn District Attorney Ken Thompson, whose conviction integrity unit has had 17 exonerations in the last two years, said his unit has a clear philosophy: ensuring that justice is done.

Three of the exonerations Thompson's office helped obtain in 2015 were connected to a deadly 1980 fire that killed a mother and her five children. The three men who were convicted had their arson and murder convictions overturned in December after Thompson's office was able to cast doubt on the fire science that helped convict the men. The office also discovered the only eyewitness who had tied the men to the fire recanted the identification on her death bed. One of the men whose conviction was overturned had died in prison in 1989.

"This case is indicative of our determination here in Brooklyn to get to the bottom of our cases, to get to the truth," Thompson said.

For the second year in a row, the large number of exonerations in Texas was due in part to individuals who had their drug convictions dismissed after lab tests determined they never had illegal substances. In 2015, there were 42 drug case exonerations in Harris County, where Houston is located — up from 31 in 2014. In these cases, individuals pleaded guilty before a lab test was completed.

Inger Chandler, chief of the conviction review section with the Harris County District Attorney's Office, said her office has since changed its policies and no longer allows pleas in drug cases until a lab report is completed. There are probably about 200 of these cases still pending in the DA's office, she said.

"That's what I'm tasked with as a prosecutor, to seek justice, not to seek convictions. Justice is making sure the wrong person doesn't go to prison just as much as it's making sure the right person does," Chandler said.

Associated Press

Copyright © 2016, Chicago Tribune

The Honorable Judge Ronnie L. White
Thomas F. Eagleton United States Courthouse
Courtroom 10 South
111 South 10th Street
St. Louis, MO 63102

January 25th, 2018

Dear Judge White,

I am the Lincoln County Jail Supervisor where Kehinda Mitchell is currently being held.  It is rare that I write a letter to express character and potential likelihood for reform to again become a model citizen of society, with the safety of the public being considered first and foremost.

Kehinda Mitchell, is an exceptional inmate. He has been housed here for almost a year and has never caused a problem. He is an excellent Barber and has the skill set to professionally make a living for himself as a Barber. During his incarceration here at Lincoln County, he has provided haircuts to both staff and inmates, without any compensation.  He is well liked by both staff and inmates. Mr. Mitchell, has conducted himself with respect for others along with being generous and polite. He is a model inmate and has brought a calming effect to his housing unit.

I trust that this letter will serve to assist you during sentencing consideration.


LT- [signature]

Lieutenant Randy Davis

Lincoln County Sheriff's Office